**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| ANTHONY WEBSTER, and MARK SMITH on behalf of themselves and all others similarly situated, | ) ) ) ) | |
| Plaintiffs | ) ) | **Case No. 1:24-cv-00117-HAB-SLC** |
| v. | ) ) | |
| BRADFORD-SCOTT DATA, LLC doing business as SHARETEC, | ) ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE PLAINTIFFS' AMENDED CLASS ACTION COMPLAINT**

## I. INTRODUCTION

Defendant, Bradford-Scott Data LLC d/b/a Sharetec ("Defendant" or "Bradford-Scott") confirmed it leaked its institutional clients' customers' and its own customers' personally identifying information ("PII" or "Personal Information") in a cyberattack that occurred from May 19, 2023, to May 28, 2023 (the "Data Breach"). As a result of the Data Breach, the PII of 41,968 individuals affiliated with Bradford-Scott—including Plaintiffs and members of the Class—was targeted, stolen, and exfiltrated by cybercriminals. That PII included names, Social Security numbers, dates of birth, financial account information, credit card numbers, and debit card numbers.

Months after the Data Breach, Bradford-Scott sent a Breach Notice to Plaintiffs and members of the Class, warning them of the Data Breach and providing them with one year of complimentary credit monitoring as an "added precaution" to "help resolve issues if [their] identity

1

is compromised."[1]

Plaintiffs Anthony Webster and Mark Smith ("Plaintiffs") filed an Amended Class Action Complaint ("Am. Compl.") that seeks redress for the harm caused by this Data Breach. Plaintiffs bring claims for negligence (Count I), negligence *per se* (Count II), breach of implied contract (Count III), invasion of privacy (Count IV), unjust enrichment (Count V), and bailment (Count VI).

In its Motion to Dismiss and accompanying brief (ECF Nos. 25 and 25-1), Bradford-Scott seeks to evade liability for its failure to properly safeguard victims' highly sensitive PII by arguing the Court lacks subject matter jurisdiction under Federal Rule 12(b)(1) and that Plaintiffs fail to state a claim for relief for any of their alleged claims under Federal Rule 12(b)(6). Alternatively, Defendant asks the Court to strike "impertinent" allegations from Plaintiffs' Amended Complaint regarding statistics on cybercrime.

In doing so, Bradford-Scott ignores decisions of the Southern District of Indiana and other Indiana courts that clearly hold plaintiffs state valid claims like the ones alleged here. *See, e.g., Johnson v. Nice Pak Prod., Inc.,* No. 1:23-CV-01734-JMS-CSW, 2024 WL 2845928 (S.D. Ind. June 5, 2024); *Krupa v. TIC Int'l Corp.,* No. 1:22-CV-01951-JRS-MG, 2023 WL 143140 (S.D. Ind. Jan. 10, 2023); *In re Eskenazi Health Data Incident Litig.*, No. 49D01-2111-PL-039970, 2022 WL 20505180 (Ind. Comm. Ct., Ind. Super. Ct. Sept. 2, 2022); *Paul v. Ardagh Glass, Inc.*, No. 49D07-2209-CT-031302, 2023 WL 5153147 (Ind. Comm. Ct., Ind. Super. Ct. Jan. 23, 2023); *Kralovansky v. Lakeshore Bone and Joint Inst., P.C.,* No. 64D01-1912-CT-011594, 2023 WL 8719870 (Ind. Super. Ct. April 24, 2023); and *In re Community Health Data Incident Litigation*,

---

[1] As referenced in Plaintiffs' Amended Complaint, a sample Notice Letter sent to affected individuals is available at https://apps.web.maine.gov/online/aeviewer/ME/40/a962e210-669d-4c3a-93ac-f3a0aff6ab43.shtml (last acc. June 26, 2024).

No. 49D01-2211-PL-041242 (Ind. Comm. Ct., Marion Co. Super. Ct. Oct. 25, 2023).

Indeed, the U.S. District Court for the Southern District of Indiana, the Indiana Commercial Court in Marion County, and other Indiana courts have exhaustively addressed identical arguments to those raised by Bradford-Scott in holding plaintiffs state valid claims under Indiana law. Similarly, here, Bradford-Scott's dismissal arguments fail. The Court should deny Bradford-Scott's motion.

## II. FACTUAL BACKGROUND

### A. Bradford-Scott Collects the PII of Plaintiffs and the Class.

Bradford-Scott is a software provider for over 280 credit unions across the country. ECF No. 20 ("Am. Compl."), ¶ 2. To run its business, Bradford-Scott collects the PII of its current and former customers (and/or the current and former customers of its institutional clients) (together "Class Members"). *Id*. ¶ 3. In terms of PII, Bradford-Scott collects and maintains Class Members' names, Social Security numbers, dates of birth, financial account information, credit card numbers, and debit card numbers. *Id*. ¶ 26.

Bradford-Scott explicitly promises—in official policies and public advertisements—that it will protect Class Members' PII. *Id*. ¶¶ 17– 22. For example, in its "Privacy Policy," Bradford-Scott promises that, *inter alia*, "[y]our personal information is contained behind secured networks and is only accessible by a limited number of persons who have special access rights to such systems, and are required to keep the information confidential." *Id*. ¶ 19. Likewise, Bradford-Scott advertises that it "knows the importance of providing the most up-to-date technology to credit unions in order to avoid any kind of threat to their member's data" and that it "will monitor all incoming and outgoing activity so your credit union will know of a problem long before that problem has caused pain[.]" *Id*. ¶¶ 21–22. And again, Bradford-Scott promises that "Intrusion

3

Testing from Bradford-Scott makes sure your network is safe all the time - from the inside out." *Id*. ¶ 22.  But despite these policies and promises, Bradford-Scott failed to use reasonable data security—rendering Class Members' PII an easy target for cybercriminals. *Id*. ¶ 3.

**B.  Bradford-Scott Breached its Duties.**

From May 19, 2023, until May 28, 2023, Bradford-Scott was hacked by cybercriminals. *Id*. ¶ 23. And "certain files were likely ***copied*** from [Bradford-Scott's] network." *Id*. ¶ 24 (emphasis added). Still, Bradford-Scott was unable to detect its own Data Breach until July 2, 2023—a full 44 days after the Data Breach began. *Id*. ¶ 25. Thus, the cybercriminals had ample time to access and steal the exposed PII of 41,968 Class Members. *Id*. ¶ 27. Critically, the exposed PII was especially sensitive, including names, Social Security numbers, dates of birth, financial account information, credit card numbers, and debit card numbers. *Id*. ¶ 26.

Confusingly, Bradford-Scott delayed warning Class Members about their exposure in the Data Breach. *Id*. ¶ 32. After all, by December 10, 2023, Bradford-Scott had "determined after the detailed data review . . . [whose] information was present in the potentially affected files." *Id*. But stunningly, Bradford-Scott waited until February 13, 2024, to begin the notice process—over ***two months after*** Bradford-Scott determined who was exposed. *Id*. ¶ 32. Thus, Bradford-Scott left Plaintiffs and Class Members in the dark about the Data Breach for over eight months after it detected the Data Breach, preventing them from taking timely action to protect themselves. *Id*. ¶¶ 34-35.

Due to Defendant's inadequate cybersecurity protections, the cybercriminals in question (1) defeated Defendant's data security systems, (2) gained actual access to sensitive data for at least nine days, (3) went undetected for forty-four days, and then (4) "likely copied" sensitive data. *Id*. And as explained by the Harvard Business Review, such "[c]ybercriminals frequently use the

Dark Web—a hub of criminal and illicit activity—to sell data from companies that they have gained unauthorized access to[.]" *Id*. ¶ 44. Thus, on information and belief, Plaintiffs and Class Members' PII has already been published (or will be published imminently) by cybercriminals on the Dark Web. *Id*. ¶ 45.

### C. Plaintiffs' Experiences

As a precondition of receiving services, Bradford-Scott required that Plaintiffs (or the credit unions at which Plaintiffs were members) disclose their PII. *Id*. ¶¶ 46–49, 63-66. But Plaintiffs (or their credit unions) would not have disclosed their PII if they knew that Bradford-Scott's data security was dangerously inadequate. *Id*. ¶¶ 50, 66. Regardless, via the Data Breach, Bradford-Scott injured Plaintiffs and exposed them to significant present (and continuing) risk for identity theft and other harms, including lost time, money, emotional harm, and diminished value to their PII. *Id*. ¶¶ 55–62, 68-74.

Critically, Bradford-Scott delayed notifying Plaintiff Webster until February 27, 2024—which was ***79 days after*** Bradford-Scott concluded its investigation and had determined who was exposed. *Id*. ¶ 52. Worse, Plaintiff Smith did not receive his Notice Letter by U.S. mail until April 30, 2024. *Id*. ¶ 67.

The exposure of one's PII is a bell that cannot be unrung—it creates an enduring and immediate danger of identity theft and fraud. *Id*. ¶¶ 76–78. After all, exposed PII is a goldmine for cybercriminals. *Id*. For example, cybercriminals can create shockingly accurate and comprehensive dossiers on individuals called "Fullz" packages. *Id*. ¶¶ 79–81. These dossiers are created by cross-referencing and combining two sources of data—first the stolen PII, and second, unregulated data found elsewhere on the internet (like phone numbers, emails, addresses, etc.). *Id*.

Thus, the PII that Bradford-Scott exposed can be combined with unregulated data to commit substantial fraud and steal the identities of Plaintiffs and Class Members. *Id*. ¶ 82.

### III.  LEGAL STANDARDS

The purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the complaint, not the merits of the lawsuit. *United States v. Clark County, Ind.,* 113 F.Supp.2d 1286, 1290 (S.D. Ind. 2000) (citing *Gibson v. City of Chicago,* 910 F.2d 1510, 1520–21 (7th Cir. 1990)). In ruling on a motion to dismiss, the court construes the allegations of the complaint in the light most favorable to the plaintiff, and all well-pleaded facts and allegations in the complaint are accepted as true. *Bontkowski v. First Nat'l Bank of Cicero,* 998 F.2d 459, 461 (7th Cir. 1993).

Accordingly, a motion to dismiss should be granted only if the plaintiff fails to proffer "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). If complaint provides "enough details about the subject-matter of the case to present a story that holds together," it is sufficient and ought not be dismissed. *Swanson v. Citibank,* 614 F.3d 400, 404 (7th Cir. 2010). "On a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint—not the plaintiffs or the court." *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008).

"In evaluating a challenge to subject matter jurisdiction, the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.,* 807 F.3d 169, 173 (7th Cir. 2015). A defendant's Rule 12(b)(1) "is properly understood as a facial challenge" when it contends that a plaintiff's complaint lacks sufficient factual allegations to establish standing. *Id.* "A facial challenge argues that the plaintiff has not sufficiently "*alleged* a basis of subject matter jurisdiction." *Id.* "In reviewing a facial challenge, the court must accept all well-pleaded factual

6

allegations as true and draw all reasonable inferences in favor o the plaintiff." *Id.*

## IV.    ARGUMENT

As follows, Defendant's Motion to Dismiss must be denied in its entirety. On all counts, Bradford-Scott fails to satisfy its burden under Rule 12(b)(1) to show the Court lacks subject matter jurisdiction because Plaintiffs have plausibly alleged Article III standing.  Similarly, Defendant fails under 12(b)(6) to show that, with the well-pleaded factual allegations in Plaintiffs' Complaint taken as true, Plaintiffs fail to state claims to relief that are plausible on each of their faces.

### A.  Plaintiffs Have Plausibly Alleged Article III Standing

To prove standing later in litigation, a plaintiff must eventually establish the three irreducible elements set forth in *Lujan v. Def's of Wildlife*: (1) that the plaintiff has suffered an "injury in fact," (2) that the injury bears a fairly traceable causal connection to the conduct complained of, and (3) that a favorable court decision is likely to redress the harm complained of. *Lujan v. Def's of Wildlife*, 504 U.S. 555, 560 (1992). As an initial matter, Defendant contends that "Plaintiffs fail to carry their burden of establishing standing to pursue this case under Article III." ECF No. 25-1 ("Def.'s Mem."), at 5. Contrary to Defendant's argument, Plaintiffs do not need to "establish" anything at this stage. Rather, at the pleading stage, the plaintiff need only *plausibly allege* that she has standing to sue. *Lujan,* at 504 U.S. at 561; *Cothron v. White Castle Sys., Inc.*, 20 F.4th 1156, 1160 (7th Cir. 2021); *Lewert v. P.F. Chang's China Bistro, Inc.*, 819 F.3d 963, 968 (7th Cir. 2016) ("At the pleading stage, the plaintiffs' factual allegations must '[] cross the line from conceivable to plausible.'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plaintiffs' allegations easily surpass the federal pleading standard.

### 1.  Plaintiffs Have Plausibly Alleged an Injury in Fact

To allege an injury in fact, a plaintiff must assert that she has suffered "an invasion of a

legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," *Lujan*, 504 U.S. at 560, such that the court is not asked to "adjudicate hypothetical or abstract disputes," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "The most obvious [concrete injuries] are traditional tangible harms, such as physical harms and monetary harms." *Id.* at 425. But intangible injuries are often concrete as well, especially if the harm alleged bears "a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts[,] . . . includ[ing], for example, reputational harms, *disclosure of private information*, and intrusion upon seclusion." *Id.* (emphasis added) (collecting cases). Moreover, a plaintiff may allege a concrete injury to support injunctive relief by averring that the defendant's actions have placed her at a heightened risk of harm such that an injury is "certainly impending." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 692 (7th Cir. 2015). Though allegations of possible future harm are insufficient, a plaintiff need not allege that such impending harms are "literally certain." *Id.* at 693; *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 153 (3d Cir. 2022) (explaining that "allegations of future injury 'suffice if the threatened injury is "certainly impending" or there is a "substantial risk" that the harm will occur.'") (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Here, Plaintiffs allege the Data Breach exposed at least their names, social security numbers, dates of birth, and financial account information, including credit and debit card information. Am. Compl. ¶ 26. Inexplicably, and despite the sensitivity of these categories of data, Defendant delayed notifying affected individuals between sixty-five (65) days and eighty-nine (89) days. *Id.* ¶ 34. For example,

The delay exacerbated Plaintiffs injuries by depriving them of the opportunity to mitigate their damages in the early stages, and thus requiring more effort later—because, among other

8

reasons, there were more months of accounts statements to review. *See* Am. Compl. ¶ 35. When Defendant finally notified Plaintiffs, Defendant instructed Plaintiffs to take action—to remain vigilant, review financial and credit accounts, educate themselves regarding identity theft and fraud, freeze their credit, and other tasks. *Id.* ¶ 36. Heeding Defendant's instructions, Plaintiffs then spent their valuable time monitoring their accounts for fraudulent activity. *Id.* ¶¶ 55, 61, 68 (explaining that "at the direction of Defendant's Notice Letter . . . Plaintiffs made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach as well as signing up for credit monitoring and identity theft protection services offered by Defendant"). Moreover, Plaintiff Smith has been harassed with an increase in spam texts, calls, and emails since the Breach because cybercriminals now have access to his personal contact information. *Id.* ¶ 70. Beyond the time Plaintiffs have had to spend responding to Defendant's Data Breach, they have also suffered intangible injuries in the form of privacy harms, anxiety, stress, sleep disruption, fear, and frustration because of the publication of their sensitive data to individuals bent on ruining their financial security. *Id.* ¶¶ 57, 71, 75.

These injuries are concrete, past injuries that courts recognize as sufficient to confer Article III standing. First, time spent dealing with the aftermath of Defendant's failures is a concrete injury. *Bridgewater v. Americold Logistics, LLC*, No. 21-1348, 2022 WL 1442981, at *3 (C.D. Ill. May 6, 2022) ("Plaintiff has alleged several injuries [sufficient to confer standing], including that he has taken time and effort to mitigate the risk of identity fraud and that he has monitored his accounts to guard against fraudulent attempts to open accounts."). Indeed, as the Seventh Circuit has explained, time spent mitigating the effects of a data breach is a concrete injury when the harm plaintiffs seek to mitigate is sufficiently imminent. As the Court noted in *Remijas* and reiterated in *Lewert*, although "mitigation expenses qualify as 'actual injuries' only when the harm is imminent,

the data breach in *Remijas* had already occurred. This made the risk of identity theft and fraudulent

charges sufficiently immediate to justify mitigation efforts." *Lewert v. P.F. Chang's China Bistro,*

*Inc.*, 819 F.3d 963, 967 (7th Cir. 2016) (quoting *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d

688, 697 (7th Cir. 2015)).

Earlier this month, the Southern District of Indiana reiterated that *Remijas* and *Lewert* are

the controlling authorities regarding mitigation damages in data breach cases.  *Nice-Pak Prods.,*

2024 WL 2845928, at *4.  The court also found, under the Indiana Model Civil Jury Instructions,

that allegations of lost time may provide a basis for compensable damages:

> Regarding damages, the Seventh Circuit has recognized the imminent and concrete
> injuries that victims of data breaches face. The Seventh Circuit has explained that
> such victims are "at risk for both fraudulent charges and identity theft," even if no
> such occurrences have yet happened. *Lewert*, 819 F.3d at 967. Such individuals
> must "spen[d] time and effort monitoring both [their] card statements and [their]
> other financial information as a guard against fraudulent charges and identity theft."
> *Id.* In offering and encouraging credit monitoring to Plaintiffs, Defendants
> "implicitly acknowledged this," *id.* since "[i]t is unlikely that [Defendants] did so
> because the risk is so ephemeral that it can safely be disregarded." *Remijas*, 794
> F.3d at 694. After all, "[w]hy else would hackers break in ... and steal ... private
> information? Presumably, the purpose of the hack is, sooner or later, to make
> fraudulent charges or assume those ... identities." *Id.* at 693.
> .
> .
> .
>
> For example, Indiana law specifically allows for damages to include "the value of
> [lost time]." Ind. Model Civ. Jury Inst. 703(3) (brackets in original). As one Indiana
> court explained, further legal proceedings are necessary "to determine the extent to
> which those damages can be compensated as arising from the Data Breach at issue
> in this case." *Paul,* 2023 WL 5153147 at *6.

*Id.*

Here, the Data Breach already occurred. *Id.* ¶ 23. Cybercriminals gained access to highly

10

sensitive personal information, including Plaintiffs financial information and their social security numbers, which they cannot change. *Id.* ¶ 26. Then, the cybercriminals had free reign to that data for forty-four days before Defendant even realized the Breach had occurred. *Id.* ¶ 25. Making matters worse, Defendant further delayed notifying affected individuals for months, thereby increasing the time required for Plaintiffs to review their accounts and bank statements to look for fraudulent activity. *Id.* 34. Notwithstanding Defendant's dismissiveness, Plaintiffs had to act. They were instructed to do so by Defendant, who would otherwise have argued that they failed to mitigate damages, and they knew their social security and financial information had been compromised by the Breach.

Thus, Plaintiffs' mitigation efforts were done, at Defendant's direction, to attempt to limit any identity theft and fraud caused by the disclosure of highly sensitive financial information and social security numbers, so they have standing to sue. *Linman v. Marten Transp., Ltd.*, No. 22-cv-204, 2023 2562712, at *3 (W.D. Wis. Mar. 17, 2023) (holding that "time spent mitigating the risk of identity theft is a concrete harm that gives him standing to sue for damages related to the breach, so the court need not consider whether the other alleged injuries are sufficient" and that lost time "is not a speculative injury because he has already suffered it"); *In re Mondelez Data Breach Litig.*, Nos. 23-cv-3999 & 4249, 2024 WL 2817489, at *3 (N.D. Ill. June 3, 2024) (explaining that even if *TransUnion* requires some "separate harm," "the time plaintiffs spent mitigating the risk of identity theft is that 'separate harm'"); *Roper v. Rise Interactive Media & Analytics, LLC*, No. 23-cv-1836, 2023 WL 7410641, at *4 (N.D. Ill. Nov. 9, 2023) (same); *Doe v. Fertility Ctrs. Of Illinois*, No. 21-cv-579, 2022 WL 972295, at *2 (N.D. Ill. Mar. 31, 2022) (same).[2]

---

[2] And courts have distinguished *Kim v. McDonalds USA, LLC*, 2022 WL 4482826 (N.D. Ill. Sept. 27, 2022), on which Defendant relies, because that case involved only non-sensitive personal information like

Next, Plaintiffs' intangible injuries constitute an independent concrete injury. The U.S. Supreme Court has made clear that intangible, dignitary harms can satisfy Article III if the alleged harms bear a close relationship to harms traditionally recognized at common law, including privacy harms related to the disclosure of private information. *TransUnion*, 594 U.S. at 425. Indeed, the Supreme Court in *TransUnion* expressly cited the "disclosure of private information" as one such intangible injury long recognized "as providing a basis for lawsuits in American courts." *Id.* ¶ 425. Naturally, and given that their highly sensitive data now resides in the hands of cybercriminals bent on identity theft and fraud, Plaintiffs have and will continue to suffer emotional harms in the form of anxiety, stress, and sleep disruption, among others. Am. Compl. ¶¶ 57, 71, 75. As the Court noted in *TransUnion*, these harms are "[c]hief among" the recognized intangible injuries that American courts have long recognized. *TransUnion*, 594 U.S. at 425.

As Judge Sweeney of the Southern District of Indiana recently explained: "There is a common-sense expectation . . . that social security numbers are best kept private and that their exposure to hackers is a harm (whether or not identity theft has yet occurred)." *Krupa*, 2023 WL 143140, at \*2. Defendant violated this common-sense expectation of privacy, and Plaintiffs must now deal with the fallout, including the emotional toll naturally occurring from the knowledge that one's financial future rests in the hands of cybercriminals. Still, Defendant entirely ignores these injuries in its motion.

Thus, Plaintiffs have alleged past concrete injuries, and so they have standing to sue.

**B. The Court Should Deny Defendant's Motion because Plaintiffs Have Plausibly Pleaded Each of Their Claims under 12(b)(6)**

---

addresses and phone numbers that may be in a person's signature block—unlike the social security numbers and financial information here. *Florence v. Order Express, Inc.*, 674 F. Supp. 3d 472, 481–82 (N.D. Ill. 2023) (distinguishing *Kim* because of the exposure of plaintiffs' "social security and driver's license numbers").

### 1. Plaintiffs' Negligence Claim is Well-Pleaded

In Indiana, the elements of negligence are "(1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care, and (3) a compensable injury proximately caused by the breach of duty." *Smith v. Walsh Constr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018). Here, Plaintiffs have adequately pleaded each of these elements and Plaintiffs' negligence claims are not barred by the economic loss rule. Thus, Defendant's Motion must be denied.

### a. Indiana courts recognize a common law duty to safeguard personal information

In Indiana "businesses have the common-law 'duty to exercise ordinary and reasonable care in the conduct of their operations ... for the safety of others whose injuries should reasonably have been foreseen or anticipated.'" *Nice Pak Prod.,* 2024 WL 2845928, at *4 (quoting *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 778 (Ind. 2024)). Indeed, it is common sense that "[e]ven in the era before digital recordkeeping, if an employer kept its employees' Social Security numbers in an unlocked box on the sidewalk for anyone to take, no one would question that the employer would be negligent." *Id.* at *4.

Nevertheless, Defendant argues that no such duty extends to digital information but it's reliance on *Aspen American Ins. Co. v. Blackbaud, Inc.*, 3:22-CV-44 JD, 2023 WL 3737050, *3 (N.D. Ind. May 31, 2023) and *Pisciotta v. Old Nat'l Bancorp*, 499 F.3d 629, 635 (7th Cir. 2007) to conclude that "Indiana law would not recognize the common law duty to safeguard private information" is misplaced. Def's Mem. at 12-13. In *Nice-Pak Prod.,* where the district court recently found a common law duty to safeguard PII, the court distinguished *Pisciotta* to find the existence of a common law duty and noted "that although *Pisciotta* interpreted the Indiana data-

breach statute, it was decided before Indiana cases permitting common law data-breach negligence claims." No. 2024 WL 2845928, at *4 (citing *Paul v. Ardagh Glass, Inc.*, No. 49D07-2209-CT-031302, 2023 WL 5153147, at *7 (Ind. Super. Ct. Jan. 23, 2023); *In re Eskenazi Health Data Incident Litig.*, 2022 WL 20505180, at *11. For the same reason, the *Aspen* court's reasoning is unavailing here as it also relied on *Pisciotta* to speculate that Indiana would not recognize a duty. *Aspen Am.*, 2023 WL 3737050, at *3-4 (N.D. Ind. May 31, 2023) ("neither party cites to any cases from Indiana supporting that such a duty exists.").

Contrary to Defendant's argument, Indiana common law principles readily allow for a duty to safeguard personal information. Indiana, which follows the Restatement (Second) of Torts section 302, "imposes a duty on anyone who has an affirmative act to act reasonably." *Paul*, 2023 WL 5153147, at *5. As the superior court recognized in *Paul*:

> The allegations show that Ardagh took the affirmative step of gathering and maintaining employee PII. Under Indiana law, Ardagh thus assumed a duty to protect this PII in a reasonable manner. This duty includes protecting against unauthorized misappropriation of the PII because the general harm of unauthorized disclosure of the sensitive PII could reasonably be expected to occur against the class of persons such as Paul who provided their PII to Ardagh as employees. Further, by taking the affirmative act of collecting the PII, Ardagh assumes a duty to maintain that information in a reasonable manner.

2023 WL 5153147, at *5 (internal citations omitted). The situation in *Paul* is thus analogous to the facts alleged here and because Defendant affirmatively collected and centralized Plaintiffs' data, it follows that Defendant had a duty to reasonably safeguard that information. Similarly, in *Eskenazi* the district court recognized a duty to safeguard PII and that the scope of the duty is informed by Section 5 of the FTC Act, HIPAA, and industry standards. *In re Eskenazi*, 2022 WL 20505180, at *10.

And finally, to the extent that Defendant argues that Plaintiffs' claim for damages is speculative, not only is it incorrect, but "further legal proceedings are necessary 'to determine the

extent to which those damages can be compensated as arising from the Data Breach at issue in this case.'" *Nice Pak Prod.,* 2024 WL 2845928, at *4 (quoting *Paul*, 2023 WL 5153147 at *6) (further noting that "Indiana law specifically allows for damages to include "the value of [lost time]" and quoting Ind. Model Civ. Jury Inst. 703(3) (brackets in original)).

Accordingly, the Court too should find that Defendant was under a common law duty to safeguard the information entrusted to it by Plaintiffs.

### b. The economic loss doctrine does not apply here

Defendant next attempts to escape from liability in negligence by arguing that even if it does have a duty to safeguard PII, Plaintiffs claim for damages is barred by the economic loss doctrine. However, this argument fails to appreciate the contours of Indiana's economic loss doctrine:

> both the Indiana Supreme Court and the Seventh Circuit agree that the term "economic loss" is a misnomer which does not necessarily lead to a proper understanding of the scope and applicability of the doctrine. Rather, it is better understood as commercial loss, not only because personal injuries and especially property losses are economic losses, ... which ... are monetized, but also because in commercial disputes, contract law is more suitable than tort law. In this case, the parties' relationship is not one of business-to-business or consumer-to-business, but employer-to-employee. In any event, at least some of the harms experienced by the Plaintiffs are not solely economic, such as lost time and worry.

*Nice Pak Prod.,* 2024 WL 2845928, at *5. Accordingly, Defendant's insistence that the doctrine applies here is without foundation.

Moreover, even if the economic loss doctrine did apply here, which it does not, the scope of the doctrine does not extend to bar non-economic damages in negligence. *Residences at Ivy Quad Unit Owners Ass'n, Inc. v. Ivy Quad Dev., LLC*, 179 N.E.3d 977, 982 (Ind. 2022). As courts regularly find, damages in the data breach context are often non-economic in nature. *See In re Arthur J. Gallagher Data Breach Litig.*, 631 F. Supp. 3d 573, 587 (N.D. Ill. 2022) (noting that

15

"emotional harms such as anxiety and increased concerns for the loss of privacy [are] types of non-economic damages"); *In re Solara Med. Supplies, LLC Customer Data Sec. Breach Litig.*, 613 F. Supp. 3d 1284, 1295 (S.D. Cal. 2020) ("Since Plaintiffs have pled non-economic losses, the Court need not consider the remaining two exceptions to the economic loss doctrine . . . . The economic loss rule therefore does not apply."); *Diehl v. CSX Transportation, Inc.*, 349 F. Supp. 3d 487, 507 (W.D. Pa. 2018) (declining to apply economic loss rule to dismiss Plaintiff's claims since she "experienced aggravation, fear, anxiety" and her allegations "appear to be plausibly based on her allegations of emotional distress. . . .").

### 2.  Plaintiffs Have Stated a Claim for Negligence Per Se

Defendant next argues that Plaintiffs cannot rely on the FTC Act as the predicate for their negligence *per se* claims because the statute does not provide for a private right of action. Def's Mem. at 15-16. However, Defendant's argument misses the mark because "'whether a statute or ordinance confers a 'private right of action' is 'a concept that is related to but distinct from the doctrine of negligence per se.'" *In re Eskenazi*, 2022 WL 20505180, at *11 (quoting *Stachowski v. Estate of Radman,* 95 N.E. 3d 542, 545 (Ind. Ct. App. 2018). As the *Nice Pak Prod.* court recently explained:

> As Defendants' brief has demonstrated, private-right-of-action claims and negligence-per-se claims "are often confused. A private right of action assumes that an allegation of a violation of a statute or ordinance gives rise to civil liability even in the absence of a common-law duty. In contrast, negligence per se assumes the existence of a common-law duty of reasonable care, and the court is asked to adopt the standard of conduct set forth in a statute or ordinance ... as the standard of conduct required under that preexisting duty, so that a violation of the statute or ordinance serves to satisfy the breach element of a negligence action. Thus, though similar, negligence-per-se claims differ in that a violation of certain statutes or ordinances 'serves to satisfy the breach element.

2024 WL 2845928, at *5.

Indeed, Plaintiffs have not asserted a cause of action for violation of the FTC Act, rather they are using the Defendant's violation of the FTC Act to inform the existence and scope of Defendant's duty to safeguard personal information. This is in accord with Indiana's doctrine of negligence per se which recognizes that allegations of an "unexcused violation of a statutory duty constitutes negligence per se 'if the statute or ordinance is intended to protect the class of persons in which the plaintiff is included and to protect against the risk of the type of harm which has occurred as a result of its violation.'" *Erwin v. Roe*, 928 N.E.2d 609, 619 (Ind. Ct. App. 2010) (quoting *Vandenbosch v. Daily*, 785 N.E.2d 666, 669 (Ind. Ct. App. 2003)). *See also, Nice-Pak Prod.,* 2024 WL 2845928, at *6 ("As other courts have similarly decided, "the FTC Act can serve as the basis of a negligence per se claim.") (citing *Perdue v. Hy-Vee, Inc.*, 455 F. Supp. 3d 749, 760–61 (C.D. Ill. 2020); *In re Ambry Genetics Data Breach Litig.*, 567 F. Supp. 3d 1130, 1143 (C.D. Cal. 2021).

Notably, Defendant fails to address the wealth of case law finding that "Section 5 of the FTC Act is a statute that creates enforceable duties, and this duty is ascertainable as it relates to data breach cases . . . ." *In re Cap. One Consumer Data Sec. Breach Litig.*, 488 F. Supp. 3d at 407 (citing cases); *see also e.g.*, *In re Marriott Int'l, Inc.*, 440 F. Supp. 3d 447, 479 (D. Md. Feb. 21, 2020) (citing cases). "[T]hese courts have found . . . that plaintiffs whose information was allegedly compromised by a data breach fit within the class of plaintiffs sought to be protected from the type of harm proscribed by the statute." *Id.*; *see also In re Equifax, Inc., Customer Data Sec. Breach Litig.*, 362 F. Supp. 3d 1295, 1312 (N.D. Ga. 2019); *F.T.C. v. Wyndham Worldwide Corp.*, 799 F.3d 236, 240 (3d Cir. 2015) (affirming the FTC's authority to enforce Section 5 of the FTC Act in data breach cases); *Kirsten v. California Pizza Kitchen, Inc.*, No. 221CV09578DOCKES, 2022 WL 16894503, at *9 (C.D. Cal. July 29, 2022), *reconsideration denied*, No.

221CV09578DOCKES, 2022 WL 16894880 (C.D. Cal. Sept. 8, 2022) (finding that Plaintiffs have plausibly alleged that Defendant violated the FTC Act and denying the motion to dismiss as to the negligence per se claim); *Perdue v. Hy-Vee, Inc.,* 455 F. Supp. 3d 749, 760–61 (C.D. Ill. 2020) ("the FTC Act can serve as the basis of a negligence per se claim" in a data breach case).

And finally, Plaintiffs have satisfied both the elements of proximate cause and injury resulting from Defendant's violation of statutory duties by alleging that defendant failed to implement proper safeguards and Plaintiffs' information was compromised as a result. *See e.g.*, *Nice Pak Prods.,* 2024 WL 2845928, at *4.

### 3. Plaintiffs Sufficiently Alleged Breach of Implied Contract.

Plaintiffs sufficiently pleaded breach of implied contract—which "derives from the 'presumed' intention of the parties as indicated by their conduct." *McCollough v. Noblesville Sch.*, 63 N.E.3d 334, 343 (Ind. Ct. App. 2016). Here, Bradford-Scott relies on *Archey v. Osmose Utils. Servs.,* No. 20-cv-05247, 2022 WL 3543469 (N.D. Ill. Aug. 18, 2022). Def's Mem. at 18. But this is surprising because *Archey* severely undercuts Bradford-Scott's argument.

In *Archey*, the court dismissed the plaintiff's claim ***only because*** the plaintiff failed "to point to some document, expression, or action of the [defendant] which indicated an intention to protect [plaintiff's] personal information." 2022 WL 3543469, at *4. Thus, the court "agree[d] with the proposition that 'it is difficult to imagine how, in our day and age of data and identity theft, the mandatory receipt of Social Security numbers or other sensitive personal information would not imply the recipient's assent to protect the information sufficiently.'" *Id.* (quoting *Sackin v. Transperfect Glob., Inc.*, 278 F. Supp. 3d 739, 751 (S.D.N.Y. 2017)).

Here, Plaintiffs succeed where *Archey* failed. After all, Plaintiffs provided ***fifteen direct quotations*** from Bradford-Scott's "Privacy Policy" and advertisements—which sufficiently

evince an implied contract by Bradford-Scott to protect Plaintiffs and Class Members' PII. *See e.g.,* Am. Compl. ¶¶ 18–22 (promising that "[y]our personal information is contained behind secured networks and is only accessible by a limited number of persons who have special access rights to such systems, and are required to keep the information confidential" and that "Bradford-Scott makes sure your network is safe all the time - from the inside out").

Moreover, *Archey*—as an Illinois decision—is unpersuasive when Indiana case law already provides clear guidance for data breaches. First, in *In re Eskenazi,* the court denied dismissal because "[p]laintiffs' entrusting [d]efendant with their PII . . . creates an inference that [d]efendant would then safeguard this information against theft." 2022 WL 20505180, at *7. Thus, a data breach "suggests a possibility that [d]efendant failed to carry out this implied duty in violation of its contractual obligation to do so." *Id*. Second, in *Krupa,* the court likewise denied dismissal because "[plaintiff] alleges that [defendant] held his personal data subject to a shared understanding that it would remain confidential, but . . . exposed that data to hackers." 2023 WL 143140, at *5.

Here, like in *In re Eskenazi* and *Krupa*, Plaintiffs alleged that "[i]n collecting and maintaining the PII, Defendant agreed it would safeguard the data" and that he "understood that a portion of the funds they paid Defendant would be used to pay for adequate cybersecurity measures." Am. Compl. ¶¶ 17, 144. And Plaintiffs provided ***fifteen*** quotations by Bradford-Scott which evidence an implied contract. *Id*. ¶¶ 18–22. Finally, as explained *supra*, Plaintiffs pleaded cognizable damages. *See also id*. ¶¶ 54–62, 69-74 (pleading, *inter alia*, delayed notification, lost time, property damage to PII, emotional damage, invasion of privacy). After all, "where actual damages are unproven, nominal damages are available for breach of contract." *Krupa*, 2023 WL 143140, at *4. Thus, dismissal is improper.

### 4.  Plaintiffs Sufficiently Alleged Unjust Enrichment.

Plaintiffs stated a claim for unjust enrichment under Indiana law. Am. Compl. ¶¶ 172–81. To its detriment, Bradford-Scott's argument hinges on out-of-state case law. *See* Def's Mem. at 21 (citing cases from Illinois and the Eighth Circuit). But such cases are unpersuasive when Indiana law already provides clear guidance. Specifically, in *In re Eskenazi*, the court denied dismissal when (1) plaintiffs provided payment and "alleged that data security . . . was part of their overall payment," (2) defendants "fail[ed] to secure . . . PII," and thus (3) defendant "retained the benefit of [p]laintiffs' full payments unjustly." 2022 WL 20505180, at *9.

Likewise, Plaintiffs here alleged that (1) he "conferred a benefit . . . [of] PII (and/or payment)" and "reasonably understood that Defendant would use adequate cybersecurity measures," (2) "Defendant instead calculated to avoid its data security obligations at the expense of Plaintiffs and Class members by utilizing cheaper, ineffective security measures," and thus (3) "Defendant should not be permitted to retain the full value of the PII (and/or payment) . . . because Defendant failed to adequately protect their PII." Am. Compl. ¶¶ 174–79.

Critically, the indirect conferral of a benefit (i.e., through a third-party) does ***not*** preclude an unjust enrichment claim under Indiana law. *Bloombank v. United Fid. Bank F.S.B.*, 113 N.E.3d 708, 729 (Ind. Ct. App. 2018) ("[T]his Court has allowed a plaintiff to recover against a defendant for unjust enrichment even when it was a third party that conferred the benefit on the defendant and the defendant did not request the benefit from the plaintiff.") (citing *Landers v. Wabash Center, Inc.*, 983 N.E.2d 1169, 1173–74 (Ind. Ct. App. 2013)). Thus, the indirect conferral—of Plaintiffs' benefit to Bradford-Scott—is immaterial at this stage. And dismissal is improper.

### 5.  Plaintiffs Sufficiently Alleged Invasion of Privacy

20

Plaintiffs stated a claim for invasion of privacy pursuant to a "public disclosure of private facts" theory. Am. Compl. ¶¶ 158–171. Here, Bradford-Scott seemingly constructs a strawman out of Plaintiffs' complaint. *See* Def's Mem. at 19 (declaring that "Plaintiffs frames their invasion of privacy under an intrusion upon seclusion theory"). But Bradford-Scott ignores—or fails to realize—that Plaintiffs' allegations give rise to a "public disclosure of private facts" theory. Am. Compl. ¶¶ 158–171.

Notably, the Indiana Supreme Court is clear that "Hoosiers may seek relief through an invasion of privacy claim premised on the public disclosure of private facts when, like here, their private information is wrongly disclosed." *Z.D. v. Cmty. Health Network, Inc*., 217 N.E.3d 527, 532–33 (Ind. 2023). And "the public-disclosure tort serves to deter the unauthorized disclosure of private information . . . [which] may be achieved by implementing protective measures, including enforcing privacy policies and security systems, as well as through adhering to state and federal regulations governing how private information is maintained." *Id*. at 534. And critically, the "public-disclosure tort is ***not*** an intentional tort." *Id*. at 533 (emphasis added).

The elements for "public disclosure of private facts" are: (1) "the information disclosed was private," (2) "the information was communicated in a way that either reaches or is sure to reach the public in general or a large enough number of persons such that the matter is sure to become public knowledge"—critically, even "disclosure to ***one person*** may, based on the facts and circumstances in a particular case, satisfy the publicity element," (3) "the information was not of legitimate public concern," and (4) "the information would be highly offensive to a reasonable person." *Id*. at 533, 536.

Here, Plaintiffs' allegations satisfy their pleading burden. *See* Am. Compl. ¶¶ 158–171. After all, via its Data Breach, Bradford-Scott (1) disclosed private information including "Social

Security numbers; dates of birth; financial account information; credit card numbers; and debit card numbers" (2) to cybercriminals (and upon information and belief, to the Dark Web). *Id.* ¶¶ 23–26. And (3) such information—e.g., Social Security numbers—is not of public concern. *See id.* Thus, (4) such exposure is highly offensive to Plaintiffs and Class Members. *Id.* ¶¶ 161–163. Therefore, dismissal is improper at this early stage.

### 5. Plaintiffs Have Adequately Alleged a Bailment

The Complaint also adequately alleges a claim for bailment. Under Indiana law, "[a] bailment arises when: (1) personal property belonging to a bailor is delivered into the exclusive possession of the bailee and (2) the property is accepted by the bailee." *Winters*, 171 N.E.3d at 699 (quoting *Cox v. Stoughton Trailers, Inc.*, 837 N.E.2d 1075, 1082 (Ind. Ct. App. 2005)). Here, Defendant challenges only the "exclusive possession" requirement. However, it is a reasonable inference that Defendant's possession of Plaintiffs' private information ***on its servers*** was "exclusive" because, once on Defendant's servers, Plaintiffs were "unable to manipulate [their] personal data. . .; [Defendant] was in full control." *See Krupa*, 2023 WL 143140, at *5.

In *Krupa*, the United States District Court for the Southern District of Indiana held a bailment claim existed in a data breach action.  The court distinguished *Albanese Confectionery Grp., Inc. v. Cwik*, 165 N.E.3d 139 (Ind. Ct. App. 2021), *trans. denied,* 169 N.E.3d 1117 (Ind. 2021), where the Indiana Court of Appeals the court held that an employer did not have "exclusive possession" of data on an employee's phone because the employee "was able to freely manipulate the data herself, notwithstanding the fact that she had granted [her employer] permission to do the same in a limited capacity." *TIC* (citing *Albanese Confectionery Grp.*, a165 N.E.3d at 148 & n.8). Similarly here, as in *Krupa*, once their personal data was on Defendant's servers, Plaintiffs were unable to manipulate or delete that data. Accordingly, as in *Krupa*, the Court should decline to

dismiss the bailment claim.

**C. Plaintiffs' Allegations are Relevant to their Claims and Should not be Struck**

Motions to strike are viewed with disfavor and are not frequently granted. *Operating Eng'rs Local 324 Health Care Plan v. G & W Const. Co.*, 783 F.3d 1045, 1050 (6th Cir. 2015) (citing *Lunsford v. United States*, 570 F.2d 221, 229 (8th Cir. 1977)). Generally, a motion to strike should be granted only when "the allegations being challenged are so unrelated to plaintiff's claims as to be unworthy of any consideration as a defense and ... their presence in the pleading throughout the proceeding will be prejudicial to the moving party." *Hobbs v. Kroger Ltd. P'ship I*, No. 3:18-CV-01026, 2019 WL 1861330, at *3 (M.D. Tenn. Apr. 24, 2019) (Crenshaw, C.J.) (quoting 5A Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 1380, at 650 (2nd ed. 1990).)

Here, Defendant seeks to strike paragraphs that give context to this litigation and are pertinent to the Court's understanding of the foreseeability of data security threats, the industry and regulatory standards by which Defendant is expected to abide, and the harm that consumers experience as a result of the compromise of PII. *See* Am. Compl. ¶¶ 76-87. While Defendant argues that the "allegations are designed to improperly inflame the issues and lend weight to the alleged risk of future identity theft," it offers nothing to support that characterization. *See* Def's Mem. at 24; *compare with Doe by Doe v. Piraino*, No. 3:22-CV-00560, 2023 WL 5310556, at *20 (M.D. Tenn. Aug. 17, 2023) ("The court finds the allegations regarding sexual misconduct involving non-entities in paragraphs 22 through 27 to be generally relevant to the question of whether the abuse at issue in this case was foreseeable. Although it is somewhat cumulative, it is not actually redundant or scandalous.") Because Plaintiffs' allegations provide necessary context to the

complaint and are neither impertinent nor prejudicial, they are properly alleged and Defendant's attempt to strike these inconvenient facts should be denied.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion must be denied.

Dated: June 26, 2024                Respectfully submitted,

                                         /s/ Lynn A. Toops
                                   Lynn A. Toops (No. 26386-49)
                                   Amina A. Thomas (No. 34451-49)
                                   **COHEN & MALAD LLP**
                                   One Indiana Square, Suite 1400
                                   Indianapolis, Indiana 46204
                                   (317) 636-6481
                                   ltoops@cohenmalad.com
                                   athomas@cohenmalad.com

                                   J. Gerard Stranch, IV*
                                   Andrew E. Mize*
                                   **STRANCH, JENNINGS & GARVEY, PLLC**
                                   223 Rosa L. Parks Avenue, Suite 200
                                   Nashville, Tennessee 37203
                                   (615) 254-8801
                                   gstranch@stranchlaw.com
                                   amize@stranchlaw.com

                                   Samuel J. Strauss*
                                   Raina Borelli*
                                   STRAUSS BORELLI PLLC
                                   908 N. Michigan Avenue, Suite 1610
                                   Chicago Illinois 60611
                                   Telephone: (872) 263-1100
                                   Facsimile: (872) 263-1109
                                   sam@straussborrelli.com
                                   raina@straussborrelli.com

                                   Gary M. Klinger
                                   **MILBERG COLEMAN BRYSON
                                   PHILLIPS GROSSMAN, PLLC**
                                   227 W. Monroe Street, Suite 2100
                                   Chicago, IL 60606

24

Telephone: (866) 252-0878
Fax: (865) 522-0049
gklinger@milberg.com

*Motion for *Pro Hac Vice* Admission to be made
pursuant to Fed. R. Civ. Proc. 89(b)

***Counsel for Plaintiffs and the Proposed Class***